IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHRISTOPHER JOHLL,

                          Plaintiff,                          OPINION AND ORDER

    v.                                                                  23-cv-618-wmc

VILLAGE OF MCFARLAND and JOHN MILLER,

                          Defendants.

This case arises from plaintiff Christopher Johll's arrest by McFarland Police Detective John Miller based on a child's allegations that another individual, who had been the focus of the detective's investigation, and Johll had both sexually assaulted him. Before Johll's arrest, the child gave four forensic interviews at the Safe Harbor Child Advocacy Center. Only at the fourth such interview, the child disclosed that he had been raped by Johll and forced to watch Johll have sex with the other individual while tied down to a chair. Johll was subsequently arrested and charged. However, the District Attorney's Office dismissed the charges after receiving alibi evidence from Johll, who then filed this suit under 42 U.S.C. § 1983, against Detective Miller and the Village of McFarland, claiming that he was arrested without probable cause in violation of the Fourth Amendment and subjected to malicious prosecution in violation of the Fourteenth Amendment.

Before the court is defendants' motion for summary judgment.  (Dkt. #48.)[1] Defendants contend that all of Johll's claims fail because Miller had probable cause to arrest Johll based on the child's accusations and, even if Miller lacked probable cause, he is entitled to qualified immunity.  Because Johll failed to identify any controlling law clearly establishing that Miller lacked probable cause to arrest Johll based on the child's accusations under the circumstances of this case, the court concludes that Miller is entitled to qualified immunity.  Therefore, defendants are entitled to summary judgment on all monetary claims.

## UNDISPUTED FACTS[2]

### A.  Background

Defendant John Miller is a detective with the McFarland Police Department, and from 2010 to 2022, he also was the School Resource Officer assigned to the McFarland School District.  During 2018 and 2019, plaintiff Christopher Johll was a housemate of Andrew Meeks, a fourth grade teacher at Waubesa Intermediate School in the McFarland School District.

---

[1] Defendants also filed motions to dismiss (dkt. #28 and dkt. #30) that raise substantially the same arguments, but which were filed before the factual record was developed.  Those motions will be denied as moot.

[2] The following factual summary provides context for plaintiff's claims and is drawn from the parties' proposed findings of fact, their responses, and the evidentiary record as appropriate.  The court notes at the outset that plaintiff objected to the detailed recitation of facts relating to defendant Miller's investigation of Andrew Meeks, who is not a party to this case.  However, the investigation of Meeks provides necessary context for defendant's eventual arrest of plaintiff.  In addition, defendant Miller's reliance on E's fourth interview statements was based, at least in part, on Miller's prior investigation and corroboration of the statements E gave about Meeks early in the investigation.

In April 2019, the McFarland School District Superintendent notified Miller that a community member had reported concerns about the nature of a relationship between a student, referred to by the parties as "E," and Meeks. The community member told the superintendent that she had observed Meeks and E spending a significant amount of time alone together at E's house, E sitting on Meeks' lap, Meeks giving E piggyback rides and Meeks patting E on the butt. The community member also stated that no other kids in the neighborhood were present at E's home during Meeks' repeated visits.

### B. Spring 2019 Investigation of Meeks

Following up on this report, Detective Miller contacted the Principal of Waubesa Intermediate School, who reported that Meeks had been E's fourth grade teacher the previous year and considered himself to be E's mentor, though they were not part of the school's official mentor program. The principal further told Miller that she had previously discussed with Meeks his behavior with E as being potentially inappropriate. Specifically, the principal had told Meeks to stop letting E and other students spend time in Meeks' classroom during lunch and recess. She had also learned from another teacher that E sometimes sat on Meeks' lap or stood between his legs in the classroom, so the principal told him to stop that as well. Miller later spoke with the school nurse, who confirmed that she had seen E either sitting on Meeks' knee or standing between Meeks' legs.

Eventually, the principal had disallowed E from going to Meeks' classroom. Nevertheless, at the beginning of E's fifth grade year, Meeks had asked that his class be paired with E's class, even though E was no longer in fourth grade, a request the principal

refused.  Still, Meeks continued to visit E in E's classroom, prompting the principal to tell Meeks that he was not allowed to do that either.  The principal further told Miller that E's mother, "AOF," had become upset at the principal's restrictions because she believed Meeks was "counseling" E.

Detective Miller then interviewed E, who was 11 years old at the time.  E reported that Meeks was his friend and former teacher.  He stated that Meeks met him at his home each morning to walk with him to school and also walked home with him after school.  E reported that Meeks and he also frequently went on runs and long bike rides together. However, E denied that Meeks had ever touched him inappropriately, stated Meeks would never do that, and said if someone did touch him inappropriately, he would tell his mother right away.  As proof, E volunteered that an uncle had touched him when he was much younger and he had told his mother about it.

After talking to E, Miller next met with his parents, neither of whom had concerns about the relationship between E and Meeks; rather, they were appreciative of the time Meeks spent with E.  Finally, Miller met with Meeks and his attorney, advising him against behavior that would give the appearance of being inappropriate.  Shortly after meeting with Meeks, Miller closed the investigation based on finding no evidence of criminal activity.

### C. August 2019 Reopening of Investigation and First Safe Harbor Interview

On August 19, 2019, E's mother, AOF, sent two text messages to Detective Miller, stating that E had disclosed things she needed to report.  Miller also received notice from

4

Dane County Child Protective Services that AOF had made a report to them regarding E. AOF then came to the police department and reported to Miller and two child protective services workers that after a series of incidents raised her concerns, she had recently prohibited E from any communication with Meeks.  Specifically, AOF reported:  seeing Meeks cuddling with E on the couch; despite removing E's cell phone privileges, Meeks continued communicating with E through video games; during a family vacation to Florida, she found E video chatting with Meeks several times; Meeks started a summer bike club for students to spent more time with E; and Meeks had told her that E could not read, seemingly as an excuse to read to E at their home.  Even more concerning, AOF reported that E had recently disclosed two to three events occurring between approximately July 27 and August 19, 2019, that AOF "believed to be sexual in nature":  (1) Meeks took E to a Spiderman movie for his birthday and attempted to cuddle with E, sulking for the rest of the movie when E rejected him; (2) E reported feeling an erection on his back during a playful wrestling session; and (3) Meeks told E he was a "special boy," that E gave him erections, and that if E wanted to have sex when he turned 18, Meeks would have sex with him.

After receiving AOF's statements, Child Protective Services scheduled a forensic interview with E at the Safe Harbor Child Advocacy Center, a non-profit center intended to be a neutral place for children to participate in developmentally sensitive and non-leading interviews.  Law enforcement investigators and Child Protective Services generally refer a child to Safe Harbor for a forensic interview if an allegation of abuse warrants further investigation.

On August 20, 2019, Robyn Klaila, a Forensic Interviewing Consultant & Mentor, conducted the first forensic interview of E, who was then 12 years old.[3]  Also present at Safe Harbor, but in a different room, were Detective Miller, a Dane County victim witness coordinator, two Child Protective Services workers, two Safe Harbor workers, and an assistant district attorney.  During the interview, E stated that he knew the difference between a truth and a lie, but that he had a tendency to lie sometimes and was working on it.  He swore under oath to tell the truth during the interview.  E then stated that he met Meeks in fourth grade, where he quickly became one of his favorite students.  Meeks placed E's desk next to his and asked E to run errands for him.  E reported that Meeks was:

> really fun to be around.  He's like – he fits my personality. He loves sports. He's funny. He's calm and casual like – go with the flow.  Like if it's like – he treats every day like a summer day.  What's going to happen?  Dude, I don't even know what's going to happen next. And he's like go with the flow.  Which is weird because of the teacher. He has stuff planned…I mean, so he's just – he's just a cool person.

(8/20/2019 Safe Harbor Inter. (dkt. #63) 18 –19.)  E also reported that Meeks "forced [him] to do his best in sports," "pushed him academically," and engaged in various activities with him, including playing Fortnite, swimming, frisbee, running, biking, reading, watching movies, and shopping.  (*Id.* at 32–33, 51–51.)  E further disclosed that Meeks and he communicated via texts, WhatsApp and X-box, using names that E's mom would

---

[3] Plaintiff filed a motion to strike "expert opinions" of Roby Klaila (dkt. #69) on the ground that her opinions are irrelevant to what a reasonable officer knew at the time plaintiff was arrested. Plaintiff is correct that a reasonable officer likely would not have Klaila's expertise in evaluating probable cause.  However, the court did not rely on any of Klaila's opinions in resolving the motion for summary judgment, so the motion will be denied as moot.

not recognize as belonging to Meeks, and that E gave him a special unicorn sticker for the bike club Meeks created. E went on to say that there were things he did not like about Meeks or made him uncomfortable, as well as that he no longer trusted Meeks. For example, E stated that at one point during the first few weeks of fourth grade, he tripped and fell into Meeks. He also reported that Meeks responded to his fall by suggesting that E had "kissed his arm" and refused to accept E's denial of doing so. The next day, E claimed that Meeks also began encouraging E to "be gay," including forcing him to say, "I am gay." While insisting that E had a crush on him, E claimed Meeks also forced him to text a girl that he did not like her.

E further reported that Meeks was controlling, pressured him to hang out with Meeks (rather than friends his own age), and he would encourage E not to tell his mom about the things that made him uncomfortable. E reported many other troubling events, including that Meeks: talked to E about his past relationships, including his first kiss and losing his virginity; showed E an educational website about puberty; wrote him many letters; showed him that the password to his phone was the shape of an E; would wrestle with E, during which Meeks frequently took his shirt off; and took him to a movie on his birthday, and proceeded to cuddle up against him, and when E moved away, Meeks made a sad face. E also volunteered that Meeks said E was one of the most important people in his life; had nicknames for E; and believed that they could "telepathically talk" by looking at the moon every night at 7:39 p.m., the favorite numbers of E, Meeks and another friend.

At one point, E asked to write down what Meeks said to him because it was difficult to say, after which E wrote down, "I had given him a boner, and when (I was 18?) if you

wanted to do things…we can talk." (*Id.* at 59.)  In response, E asked if he could pretend Meeks had never said that, and Meeks told E that he should "not tell anybody, because if you do, I could get into a lot of trouble." (*Id.*)  Finally, one time when they were swimming together, E thought he felt Meeks' erection against his back.  (*Id.* at 60.)

After this first forensic interview, none of the professionals present expressed concerns about E's truthfulness.  That same week, Detective Miller met with E and his mother AOF at their home, and E gave Miller a folder of letters and gifts that he received from Meeks.  Miller also collected E's phone and tablet for forensic analysis.  In addition, Miller viewed a cork board in E's room that Miller described as a "shrine" to Meeks, including several awards that Meeks had made for E.

On August 23, 2019, AOF contacted Detective Miller, reporting E had disclosed that Meeks talked to him about sex, oral sex, masturbation and pleasure spots.  She also reported that E was having nightmares about Meeks, and that she recalled an incident where E and Meeks were playing frisbee and she saw E bite Meeks' ear.  After receiving this information, Miller contacted Child Protective Services to suggest another Safe Harbor Interview.  A second interview was then scheduled for August 27, 2019.

Between the first and second Safe Harbor interviews, Detective Miller also interviewed several of Meeks' other students who had been in Meeks' classes, his summer bike group, or had played online games with him.  None of the other students reported any inappropriate or sexual contact, though:  one student reported spending one-on-one time with Meeks outside of school; another student confirmed Meeks' online gaming tags,

close relationship with E and the significance of the 7:39 numbers; and yet another confirmed the unicorn bike club sticker.

### D. Second Safe Harbor Interview

On August 27, 2019, Robyn Klaila conducted a second forensic interview of E at the Safe Harbor Child Advocacy Center. Several individuals were present in another room during the interview, including Detective Miller, an assistant district attorney, and representatives from Safe Harbor and Child Protective Services. At the beginning of the interview, E stated he knew the difference between a truth and a lie, and he swore to tell the truth. E stated he did not have a very good memory, so he had made a list of things to talk about at the prompting of his mother.

E's list included numerous things to discuss, including: (1) Meeks was an "alpha," who showed his dominance by biting him on the ear when they would wrestle, and also that "alpha means being on the top" during sex; (2) Meeks traveled to Detroit once a year to visit a friend and use drugs; (3) Meeks randomly talked about sexual things, including telling him that he liked blowjobs and giving anal sex; (4) Meeks asked E if he was circumcised; (5) while at the movies on E's birthday, Meeks used a beef stick to show him "how to give a proper blowjob"; (6) Meeks played music about "coming out" because he thought E was gay; (7) Meeks asked him if he masturbated; (8) Meeks asked E if he had looked up any techniques to masturbate; (9) Meeks described the pleasure spots on a man and a woman; (10) Meeks told him about the term "shaking someone's salad"; (11) Meeks told him how to get aroused by vibration, including using an electric toothbrush or lawn

mower; (12) Meeks had deleted items from E's phone; (13) Meeks bit E's ear while wrestling; (14) Meek told E to use a puffer fish when texting with Meeks if he had to go because his mom was coming; (15) Meeks gave him piggyback rides in the yard; (16) Meeks told E that twirling a towel and snapping someone with it was like a "sexual whip"; (17) Meeks let E steer his car; and (18) Meeks and E had a safe word, "sardine," though E never used the safe word. E further described being angry, traumatized and paranoid as a result of Meeks' conduct. He had also lost his love of running and playing games, was afraid of dark rooms, and could not go play outside at night because he was afraid Meeks would be there and take him.

At the end of the interview, none of the professionals present expressed reservations about E's truthfulness, and Miller concluded that he had probable cause to arrest Meeks. Miller later arrested Meeks for child enticement, causing mental harm to a child, and exposing a child to harmful descriptions.

After Meeks' arrest, Miller interviewed additional students. One student confirmed Meeks' friendship with E and stated that Meeks only played online games with kids so he could chat with them. Another student's parent reported that Meeks had visited her son at their home without her permission or knowledge.

Miller next executed a search warrant of Meeks' home, during which he found: a bike helmet with a unicorn sticker matching E's sticker; an Amazon package containing clothes in E's size; a card from E near Meeks' bed; a framed picture created by E with a photograph of E placed onto the frame; several typed letters to E; and a stuffed pink

unicorn matching one that Meeks had given E. Miller also found a letter that E had written to Meeks, who he referred to as "buff–alo," stating:

> [T]his summer has been the best feet down. U mean so much to me. Well that's a no brainer. Also you're my best friend this summer and beyond. I appreciate you as a friend/mentor. You're awesome, fun, and competitive and hopefully I'll beat you in something (not Fortnite) and maybe someday you'll beat me in Fortnite.

(Farrell Decl. (dkt. #68) ¶ 46.)

Two days later, AOF texted Miller, saying, "Just found out they are not charging him today. Having a small melt down about that. Do you feel ok with the fact that they aren't charging him? Is there not enough evidence?" (Dkt. #68-16.) A few days after that, AOF contacted Miller again because E had reportedly told her that while E was in the restroom, he thought Meeks may have ejaculated into E's Culver's drink, which he proceeded to drink. As a result, Miller referred E for a medical examination, which was conducted on September 7, 2019. The exam showed no evidence of external trauma or sexually transmitted infections.

Continuing his investigation, Miller also received a message from someone named Dominic Davis. Davis claimed to know Meeks, who had told him that he was mentoring a former student dealing with his sexuality. Miller also contacted plaintiff Johll on September 11, but he invoked his right to remain silent. After reviewing the digital forensics of E's phone and tablet, Miller further confirmed that Meeks and E had exchanged thousands of messages on WhatsApp between October 1, 2018, and August 11, 2019, including a message in which Meeks asked E if he had looked at the sun at 7:39. There were also 19,392 text messages sent between Meeks, E and AOF during the same

time period.  In some of these messages, Meeks referred to E as "rainbow," and E referred to Meeks as "Pegasus."  There was also a text message where Meeks referred to himself or E as being the "alpha."

In mid-September 10, 2019, AOF contacted Miller once more to report that E had now created a list of "30 things" to disclose, including that Meeks had shown E pornography on PornHub.  The district attorney's office then requested another Safe Harbor interview.

### D. Third Safe Harbor Interview

Robyn Klaila again conducted E's forensic interview at Safe Harbor on September 24, 2019, with several others observing from another room.  Once more, Klaila administered an oath, and E again agreed to tell only the truth.  He stated that he had mixed feelings about being back because it was nerve wracking; he also felt guilty about not telling everything before because some things were "pretty inappropriate."  (9/24/2019 Safe Harbor Inter. (dkt. #65) 8, 76.)  E also stated he was worried that Meeks would hire a lawyer, who would then question why he had gone to Safe Harbor three different times. During this interview, E had brought a red notebook with him, which he referenced while he spoke.  E stated that he had written everything in his journal himself, and no one helped him or told him what to write down.

E then proceeded to describe several incidents involving Meeks that he had not previously disclosed, including:  Meeks telling him that the gravel road "game him a boner" while on a bike ride; Meeks talking about a condom machine in a gas station while on the

12

same bike ride; Meeks "educating him in everything sexual," including talking about different sexual positions, types of sex, sex slang, pornography and how to search for it, and masturbation; Meeks possibly ejaculating in E's drink while he was in the restroom at Culver's; Meeks placing E's hand on his erect penis and petting E's penis during the birthday movie outing; Meeks telling him that is was normal in other countries for young and still maturing people to have sex; Meeks telling him that the youngest boy to have a child was 11 years old and the mother was 35, the same ages as E and Meeks at the time; Meeks teaching E how to put a condom on a banana, then simulating sex; Meeks telling him about masturbating a dog while masturbating himself; and Meeks telling him he could give himself a blow job.  Although E did not want to discuss all of the items in his notebook, he eventually did, including that Meeks:  had a lot of pubic hair; told him he could have an orgasm in 30 seconds; told him that he masturbated into the air and tried to catch it; and had a "5-some" sex experience.

Detective Miller noted that E appeared visibly upset during this third forensic interview, at one point draping himself in a weighted blanket and covering his face.  He was also unable to speak certain words and wrote them down for Klaila to read instead.  E stated his friendship with Meeks had been "normal" until January of 2019, when E was in the middle of the fifth grade, and that all of his complaints were from January 2019 through early August 2019.  (*Id.* at 59.)  Finally, E stated that "Any time I see anybody that looks relatively like him, I have a full on panic attack."  (*Id.* at 75.)

After this interview, Miller confirmed the date of the birthday movie outing.  He also spoke with another student and his parents, who reported Meeks telling them their

son was gay but that he was uncomfortable telling them.  In addition, Miller spoke with E's fifth grade teacher, who reported that Meeks had spoken to her about E before the beginning of the school year.  In particular, she recalled Meeks stating that E was an emotional child and needed special attention, jobs and special treats, as well as that E had "come out as being gay and liking boys, but can't tell his family."  In addition, she recalled Meeks being upset that a particular girl who liked E had been placed in the same class, and suggesting that E should not be paired with that girl.  The teacher further said Meeks talked about spending time with E over the summer and that he stopped by her classroom everyday to see E, which stopped only after she reported Meeks' behavior to the principal and school psychologist.

Detective Miller spoke with two additional adults about Meeks.  In October 2020, an individual who had known Meeks for years told Miller that he thought Meeks was obsessed with E based on how much he talked about him.  Another individual who operated a small farm where Meeks had worked during the summer also told Miller that Meeks was obsessed with E and would become upset if E did not call or text him back. Meeks had also told that individual about his talking to E about queerness and sexuality. As a result, that individual eventually prohibited Meeks from returning to the farm due to his apparent obsession with E.

On January 26, 2021, Detective Miller received yet another phone call from AOF, who reported that E disclosed that he was sexually assaulted by Meeks and his roommate/boyfriend.  AOF further stated that she believed E was telling her the truth because of the pain and discomfort she could see on his face and hear in his voice.  Finally,

14

AOF reported after this disclosure that E cried and had to sleep in her bed, refused to attend school the next day, talked about self-harm, and was afraid of leaving the house. After Miller reported the information to Child Protective Services, another Safe Harbor interview was scheduled.

### E.  Fourth Safe Harbor Interview

On March 3, 2021, Klaila conducted a fourth forensic interview with E.  Several individuals were present either in another room or on zoom, including Detective Miller, an assistant district attorney, and Child Protective Services representatives.  E again swore to tell nothing but the truth.  He stated that he was there to talk about Meeks, Chris Johll and sexual abuse, with the "biggest and most stressful thing being rape."  (3/3/2021 Safe Harbor Inter. (dkt. #66) 17.)  E stated that Meeks made him think the rape was normal by telling him it was punishment.  E stated that four or five rapes occurred at Meeks' home and one occurred at E's home.

E stated that the first rape occurred when he was 10 years old, on the date of the World Cup finals for soccer between France and Croatia.  He stated that Meeks and he had attended a live showing of that match at Breese Stevens Field in Madison, but there were technology issues so they left and went to Meeks' house to finish watching the game. When they arrived at the house, Meeks offered to give him a tour, even though E had been there before.  E described Meeks' room, including his colorful rocks and a packaged condom on the bedside table.  Meeks told E he was going to show him how to use it. Meeks then pulled down his own pants, started playing with himself, put the condom on,

and finished.  E stated that he was shocked, and this was the first time it had happened.
E stated that Meeks then put on another condom, grabbed E and leaned him over his bed.
While this was happening, E stated that Meeks' roommate Johll walked by the room,
laughed in a sinister way, and then proceeded to participate in the rape by holding E down
while Meeks raped him, after which Meeks held E down while Johll raped him.  E
specifically stated that Johll "put his penis in my butt" and that it hurt.  (*Id.* at 37.)  E also
described Johll as having red hair and being very skinny, stating that this was the only time
that Johll had sexually assaulted him and the only time that Johll was present.

E further stated that after raping him, Meeks and Johll tied E up with rope, bound
him tightly to a chair in Meeks' bedroom, duct taped his mouth, and forced him to watch
them engage in sexual acts.  After they were finished, E says that Meeks knelt down in
front of him and sternly told him not to tell his mom.  E and Meeks then ran back to his
home, although E was in a lot of pain, very sore.

E stated that he was afraid to tell anyone of the rapes because he "was so scared that
[Meeks] would find out and get mad at me because he had hit me before."  (*Id.* at 49.)
When asked about Meeks hitting him, E testified, "I don't know. He would just do it.  I
don't know any specific times or detail, but he would just hit me."  (*Id.* at 66.)  When
asked where on his body Meeks would hit him, E testified, "my cheek or my – I don't
know. My arm.  He would just hit me.  Most of the time it was my face."  (*Id*).  E stated
he had been raped four or five times at Meeks' home, but that:

> I don't know any details about any of those ones because those are – I don't
> want to say irrelevant, but they're irrelevant compared to the other times.
> They were simple.  He would drag me into a room in his house.  He would

> drag me into his room, pull down his pants, pull down my pants, put on a
> condom and then did it. There's no detail. Nothing special about those.

(*Id.* at 61–62.) E also reported an incident that took place at his home while his parents and siblings were gone on a walk, describing a room with a bunch of mattresses where Meeks took him and "put his penis in my butt." (*Id.* at 56.)

E stated that he felt guilty for not telling everything the first time because that would have made things easier. He reported that his biggest fear was that people would think that he was lying, because he had a history of telling lies about little things, but hoped people would believe him because "[a] lot of these words and actions I was not too familiar with and I had no idea that they really existed. I couldn't make them up." (*Id.* at 45.) E stated that he had finally decided to talk about the sexual assaults because he had become "super depressed" and his "mental health was terrible." (*Id.* at 73.) He also stated that he had locked the memories away to protect himself, and his mom told him sometimes people cannot access bad memories. (*Id.* at 44, 73.) Toward the end of the interview, E asked if Meeks and Johll were going to be arrested, stating that he wanted them to be arrested for everything that they had done to him.

Near the end of this fourth forensic interview, Klaila and E took a break. The multidisciplinary team discussed in particular the escalation of information from the previous Safe Harbor interviews, but no one expressed alarm or any reservations regarding the veracity of E's statements. Similarly, Detective Miller did not have concerns about E's delayed disclosure of information because victims of sexual assault may initially deny sexual assault due to fear, shame or lack of trust with the police, but in his experience, they

may disclose details later.  Miller did ask Klaila to question E about how Meeks and he traveled between the Breese Stevens field and Meeks' house on the date of the first rape. E again responded that they had run.

Plaintiff submitted evidence showing that the distance between the stadium and Meeks' house is about four miles, and the distance between Meeks' home and E's home is about six miles.  After the fourth interview, Detective Miller also reviewed the photographs taken during the search of Meeks' home; and he compared the photographs to E's description of Meeks' bedroom and furniture.  Miller also went to E's home to view the basement storage room, noting that it was a room full of mattresses as E described.  Finally, Miller determined that the France versus Croatia world cup game was held on July 15, 2018.

### F.  Johll's Arrest

Johll and Meeks had been out of town until March 8, 2021.  On that day, however, Detective Miller and another officer went to their residence.   Miller knocked on the front door and was met by Johll, who stepped outside and closed the door behind him.  Miller then arrested Johll and transported him to Dane County Jail.  Johll declined to talk to Miller, stating instead that he wanted a lawyer.  Miller requested that Johll be charged with sexual assault or a child, false imprisonment and causing a child to view sexual activity. Miller prepared and filed a probable cause statement that stated:

> On March 3, 2021, a Safe Harbor interview was completed with child victim E[].  During this interview E[] described an incident that occurred on July 15, 2018, at the address of 117 Acewood Blvd., Madison, WI.  At the time of the incident E[]

was 10 years of age.  E[] identifies Christopher M. Johll as one
of two people who sexually assaulted him.  E[] states that while
at the home, Johll held him down on the bed while another
adult male had forced anal sex with him. E[] states that the two
adults changed places. The other adult male now held E[]down
while Johll had forced anal sex with him. E[] states that after
this, both Johll and the other male tied E[] to a chair in the
same room, and was forced to watch while Johll and the other
male had anal and oral sex with each other. E[] states that the
other male in question is identified as Andrew Meeks, E[]'s
former 4th grade teacher. Christopher Johll was 37 years old at
the time of this incident. E[] describes the sexual intercourse
as, "he put his penis into my butt."

(Dkt. #49-1.)

However, in June 2021, Johll provided an alibi for July 15, 2018 -- the same date

on which E accused Johll and Meeks of raping him.  In July 2021, the Dane County District

Attorney's dismissed all of the charges that it had filed against Meeks and Johll.


OPINION

Plaintiff contends that the defendant Miller violated his Fourth Amendment rights

by (1) arresting him without probable cause, (2) omitting material facts from his probable

cause statement, and (3) subjecting him to wrongful pretrial detention.  He also contends

that Miller maliciously prosecuted him in violation of the Fourteenth Amendment.

Defendants move for summary judgment on all plaintiff's claims, contending that because

Miller had probable cause to arrest plaintiff, all plaintiff's claims must fail on the merits or

at least under the doctrine of qualified immunity.

Whether there was "probable cause to arrest [plaintiff] is separate from the question

relating to qualified immunity." *Schimandle v. Dekalb Cnty. Sheriff's Off.*, 114 F.4th 648,

654 (7th Cir. 2024) (quoting *Fleming v. Livingston County*, 674 F.3d 874, 879 (7th Cir.

2012)).   Here, the court begins by addressing qualified immunity, since that issue is dispositive. *Schimandle*, 114 F.4th at 655 (district court may resolve case on qualified immunity without addressing whether probable cause existed).

Qualified immunity shields government officials from monetary liability unless they "violate clearly established statutory or constitutional rights." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).   When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff has the burden of defeating it by showing that the defendant violated a clearly established statutory or constitutional right. *Gupta v. Melloh*, 19 F.4th 990, 1000 (7th Cir. 2021).   To be clearly established, the right must be "sufficiently clear that every reasonable official would understand that what he is doing violates that right." *Schimandle*, 114 F.4th at 655.   At this step, the Supreme Court has frequently cautioned against defining that law at too high a level of generality. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam).

The Fourth Amendment's prohibition against "unreasonable searches and seizures" is clear, *Taylor v. Schwarzhuber*, 132 F.4th 480, 487 (7th Cir. 2025), in that "Fourth Amendment seizures are reasonable only if based on probable cause." *Bailey v. United States*, 568 U.S. 186, 192 (2013); *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019).   Probable cause, in turn, exists when there is a probability or substantial chance of criminal activity. *District of Columbia v. Wesby*, 583 U.S. 48 (2018).   Thus, on the merits, there can be "no question that [plaintiff's] constitutional right to be free from arrest

without probable cause was clearly established at the time of the incident." *Schimandle*, 114 F.4th at 655.

However, an officer is still entitled to qualified immunity in a false arrest case when "a reasonable officer could have mistakenly believed that probable cause existed," sometimes referred to as "arguable probable cause." *Id.* at 656. Although closely related, a determination of actual probable cause is separate and distinct from arguable probable cause. *Id.* In particular, arguable probable cause is established when "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well-established law." *Id*. (citation omitted). Whether arguable probable cause supports qualified immunity is a "pure question of law to be decided by the court." *Cibulka v. City of Madison*, 992 F.3d 633, 639 n.2 (7th Cir. 2021). Just as with the assertion of probable cause, *Illinois v. Gates*, 462 U.S. 213, 232–33 (1983), to decide whether an officer had arguable probable cause, the court looks at the totality of the circumstances. *Cibulka* 922 F.3d at 639 n.2; *Garcia v. Posewitz*, 79 F.4th 874, 880 (7th Cir. 2023) (per curiam).

In this case, plaintiff Johll claims he was falsely arrested and detained on charges of: first degree sexual assault of a child; causing a child under 13 to view or listen to sexually explicit conduct; and false imprisonment. In contrast, defendants argue that Miller had probable cause to arrest plaintiff for these offenses based on E's statements during the fourth Safe Harbor interview, which established each element of the three offenses. *See Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013) (when officers make an arrest for a violation of state law, probable cause depends on "the elements of the predicate

criminal offense(s) as defined by state law"). As he must, plaintiff concedes that E's statements during the fourth interview support each element of the predicate criminal offenses charged. (Plt.'s Opp. Br. (dkt. #71) 53.) However, plaintiff argues that E's statements were not sufficiently reliable, by themselves, to support probable cause. The relevant question for qualified immunity, then, is whether a reasonable officer in the same circumstances and possessing the same knowledge as Miller could have reasonably believed that probable cause existed based on the totality of the circumstances.

Defendants argue that a reasonable officer could have believed E's statements about plaintiff's participation in the alleged July 2018 sexual assault based on the totality of the circumstances. First, none of the professionals charged with assessing the credibility of a child victim's report of sexual abuse who observed *any* of the Safe Harbor interviews, including the fourth, expressed reservations about E's statements, despite the escalation of his allegations over the course of these four interviews. Second, E's description of Johll's sexual assault, as well as other behaviors of Meeks, contained graphic and explicit details that would be unusual for a young person to fabricate, including that the assailants put on condoms, tied him up, held him down, and assaulted him, as well as how they proceeded to have sex with each other in front of E. Third, Miller had been able to corroborate many of the details that E reported in his previous interviews regarding his relationship with Meeks, including the significant amount of unsupervised time they spent together doing a variety of activities; an overwhelming amount of texting and messaging; Meeks' code names for himself and nicknames for E; Meeks' apparent *fixation* with E both inside and outside of school; the special use of the numbers 7-3-9; Meeks' providing gifts, stickers and letters

22

to E; Meeks' creation of a bike club and playing video games so that he could continue to hang out regularly with E during the summer and his subsequent, fifth grade year; and Meeks' attempting to communicate with E even after his mother prohibited such communication. Fourth, E was able to provide a physical description of plaintiff Johll, as well as Meeks' house and room where both Meeks' and Johll's sexual assault reportedly occurred. Fifth, and finally, E had no apparent grudge against plaintiff Johll, or any other apparent reason to fabricate a sexual assault story involving him. Defendants contend that the totality of these circumstances were sufficient to establish at least arguable probable cause, especially with Miller's having been able to corroborate much of E's earlier statements.

Moreover, the conclusion that there was *at least* arguable probable cause to arrest in this case is supported by Seventh Circuit precedent. In particular, the Seventh Circuit has held that an "[i]dentification by a single eyewitness who lacks an apparent grudge against the accused person supplies probable cause for arrest." *Phillips v. Allen*, 668 F.3d 912, 915 (7th Cir. 2012); *see also United States v. Davis*, 119 F.4th 500, 506 (7th Cir. 2024) ("[E]yewitness and victim reports establishing the elements of a crime, absent credibility concerns, almost always suffice to find probable cause to arrest."); *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) ("Normally, an officer may base a determination of probable cause on information from the putative victim if the officer reasonably believes that the victim is telling the truth.")

Further, because of the associated trauma and possibility for suppressed memories, when the eyewitness is a putative sexual assault victim, an investigating officer is given

even more leeway. *Garcia*, 79 F.4th at 880; *Beauchamp v. City of Noblesville*, 320 F.3d 733, 744–45 (7th Cir. 2003). "In sexual-assault cases, an officer may find probable cause even more easily when a witness is inconsistent or has memory problems because these reactions are not rare among victims of such crimes." *Garcia*, 79 F.4th at 880; *see also State v. Cabagua*, 2018 WI App 16, ¶ 31, 380 Wis. 2d 281, 913 N.W.2d 233 ("[I]t is common for children to delay reporting sexual assaults due to fear, embarrassment, or guilt") (citation omitted). In such cases, "[a]n officer need not even believe that a witness is reliable to determine that her statement supports probable cause for an arrest because the assessment of credibility rests with courts, not officers." *Garcia*, 79 F.4th at 880; *see also Coleman v. City of Peoria*, 925 F.3d 336, 351 (7th Cir. 2019) ("[E]ven assuming defendants subjectively doubted [victim's] identifications, it is for the judge and jury to weigh her evidence."). Indeed, "[e]ven a recantation of a [victim's] statement does not on its own negate probable cause." *Garcia*, 79 F.4th at 880.

Given this consistent, unfavorable Seventh Circuit precedent, plaintiff faces a high hurdle to identify a reasonably analogous case that unambiguously articulated the constitutional right at issue *and* applied it to a similar factual circumstance, much less show that the Fourth Amendment violation in charging him was so obvious that a reasonable official in the defendant's position *necessarily* would have known that he lacked probable cause to arrest plaintiff. *Cibulka*, 992 F.3d at 640; *Leiser v. Kloth*, 933 F.3d 696, 701–02 (7th Cir. 2019). Regardless, plaintiff does not even cite an analogous case -- nor could this court find one -- clearly establishing that no reasonable officer could find probable cause under the totality of the circumstances here.

24

Instead, plaintiff argues that the lack of probable cause was obvious here:  "[A]ny reasonable officer would know that the constitution demanded a further investigation because E's unreliable, uncorroborated final statement could not carry the day.  The violation is simply obvious."  (Plt.'s Opp. Br. (dkt. #71) 96.)  In making this argument, plaintiff relies on the caveat included in many decisions regarding an officer's reliance on a witness's or victim's statement:  an officer should investigate further if the there is reason to be "suspicious."  *Beauchamp*, 320 F.3d at 745 (An "officer has a further duty to investigate" when "[t]he complaint of a single witness or putative victim ... would lead a reasonable officer to be suspicious.")  However, in arguing that any reasonable officer would have found E's accusations at the fourth Safe Habor interview to be highly suspicious, at the very least, plaintiff ignores all of the corroboration Detective Miller has already received regarding E's earlier statements *and* the fact that plaintiff had at least been living in the same home with Meeks when much of his problematic activities with E were ongoing.

Another problem for plaintiff is that U.S. Supreme Court and the Seventh Circuit have given little guidance to date as to when or how a complaining witness's account becomes so suspicious that additional investigation is required.  Rather, in those cases in which the Seventh Circuit has even considered whether an officer erred in relying on the account of a witness (and an alleged victim in particular), the court has ultimately concluded the account was sufficiently credible.  *E.g.*, *Garcia*, 79 F.4th at 880; *Beauchamp*, 320 F.3d at 744–45; *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 439 (7th Cir. 1986).  Plaintiff does not cite any cases within this circuit in which the court of appeals concluded

25

that an officer was liable under the Fourth Amendment and § 1983 for failing to investigate a victim's account.

In fairness, plaintiff does identify several reasons why a reasonable officer should be suspicious of plaintiff's statements, starting with glaring inconsistencies between E's first, second and third interviews, in which he promised to tell the truth but repeatedly denied he had been sexually assaulted, and his fourth interview, in which he accused both plaintiff and Meeks of violent rapes. Certainly, E's four interviews included inconsistencies about the extent of Meeks' abuse, as well as plaintiff's involvement. But again under circuit precedent, these inconsistencies are not dispositive of probable cause, particular in cases involving putative sexual assault victims. To the contrary, the Seventh Circuit has observed that "lapses in memory are not uncommon for victims of sexual assault," which is why "the responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts." *Garcia,* 79 F.4th at 881; *see also Coleman,* 925 F.3d at 351 ("[P]olice officers are constantly faced with reluctant witnesses, recanted confessions, and witness identifications replete with inconsistencies, but the weighing of evidence is for the judge and jury."); *Spiegel v. Cortese,* 196 F.3d 717, 725 (7th Cir. 1999) (A victim's report need not be "unfailingly consistent to provide probable cause." "The credibility of a putative victim is a question not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial.").

Next, plaintiff points out E's phraseology and demeanor during his interviews, in which he seemed happy, healthy and well-adjusted during a time period when he would later claim to have been suffering horrific abuse. In particular, plaintiff points out that

during the period of alleged abuse, E exchanged numerous letters and texts with Meeks, as well as spent a significant amount of time with him. Again, however, plaintiff cites no controlling law stating that these details would cause *all* reasonable officers to doubt plaintiff's credibility. This argument also ignores that Detective Miller had already corroborated some of E's reports of inappropriate behavior by Meeks during this same time period, including a disturbingly excessive amount of meddling with E's schooling and friends. Further, all of these critiques go to E's credibility, and the Seventh Circuit has held that the law enforcement need not resolve all doubts about a witness's credibility before finding probable cause to arrest. *See Beauchamp*, 320 F.3d at 743, 745 (holding that it is not the obligation of the police to exclude all suggestions that the witness is not telling the truth; rather, "the responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts").

Plaintiff also points out that some of the language and behavior during E's fourth interview were not what one would expect of a child rape victim. Specifically, plaintiff questions E's description of some rapes as "irrelevant" and "nothing special"; his description of plaintiff as a "pretty irrelevant character"; his failure to act more afraid at his revelations; and his statements that he wanted Meeks and plaintiff to be arrested. Again, however, plaintiff cites *no* legal authority clearly articulating to Miller or another reasonable officer that such behavior completely undermines a finding of probable cause. Because there remains no "rulebook" for how a rape victim should act when disclosing an assault years later to a relative stranger, defendant Miller did not commit an obvious constitutional violation by primarily relying on E's statements in evaluating probable cause.

27

Finally, plaintiff argues that a lack of any direct evidence corroborating E's claim that Meeks or he were involved in any sexual assault, save E's report, not even something as simple as verification of dates and locations of plaintiff when E accused him of rape. In addition, plaintiff points out that: no child pornography was found on any of Meeks' devices; there was no physical evidence of E's accusations of rape, physical abuse, or alcohol and drug use; and there was nothing linking plaintiff to any sexual abuse, again besides E's say-so. Plaintiff further points out how unlikely it would be for a 10-year-old who had just been sexually abused by two grown men to then run six miles (between Meeks' house and E's house), without showing any signs of trauma. Accordingly, plaintiff suggests that E's mother likely encouraged his accusations of rape against Meeks and plaintiff because she was upset Meeks had not been convicted of a serious crime. Most of all, plaintiff argues that Miller should have investigated further before arresting plaintiff given the lack of reliable evidence, particularly in light of the lack of any exigency requiring an immediate arrest.

The court agrees that law enforcement *should* have conducted further investigation before arresting and charging plaintiff, as opposed to Meeks. "But the Fourth Amendment does not define as probable cause whatever good police practice requires, or whatever proves necessary to prevail at trial." *Gramenos*, 797 F.2d at 440. Good police practice may require interviews, but the Constitution does not require police to follow the best recommended practices. *Id.*; *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1247 (7th Cir. 1994) (noting that evidence of interviews and investigations is "not in any way a prerequisite to a finding of probable cause").

In sum, plaintiff has failed to show that this case qualifies as an "obvious" example of one in which the law required defendant Miller to investigate further before arresting plaintiff, at least absent inconsistencies in E's statements that would negate probable cause and make a constitutional violation was otherwise obvious under then existing law. Thus, defendant Miller is entitled to qualified immunity on all plaintiff's claims.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #48) is GRANTED.

2) Defendants' motions to dismiss (dkt. #28 and dkt. #30) are DENIED as moot.

3) Plaintiff's motion to strike (dkt. #69) is DENIED as moot.

4) The clerk of curt is further directed to enter final judgment in defendants' favor and close this case.

Entered this 6th day of May, 2025.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

29